**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | Cr. No. 12-CR-163 (BAH) |
| | ) | |
| KRISTEN M. JASPER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### KRISTEN M. JASPER'S MEMORANDUM IN AID OF SENTENCING

On August 14, 2012, Ms. Kristen M. Jasper, the defendant, entered a plea of guilty to a one count Information charging her with making a false statement in violation of 18 U.S.C. § 1001.  She will appear before this Honorable Court for sentencing on February 8, 2013.  Through undersigned counsel, Ms. Jasper respectfully submits the following information for the Court's consideration in determining an appropriate sentence.

As set forth in greater detail below, Ms. Jasper has just given birth to a baby girl, Cora, who, like all newborn infants, needs her mother.  When that fact is combined with other case-specific factors, such as (1) that Ms. Jasper's offense conduct was far less egregious than those background investigators who received five or even three months of imprisonment; (2) Ms. Jasper's extraordinarily low risk of recidivism; (3) her early acceptance of responsibility and significant remorse for her actions; and (4) the highly questionable method of calculating loss (and therefore measuring the actual harm) in these cases, the defense respectfully submits that the Court should sentence her to a term of probation, substituting a term of house arrest with electronic monitoring for any term of incarceration and requiring Ms. Jasper to perform community service.

## BACKGROUND

A.     **Kristen M. Jasper.**

Ms. Jasper is a 28-year old recent mother who, while under significant pressure, took short-cuts in her job that constituted criminal false statements.  She is extremely remorseful and has been punished in significant ways already.  She resigned from her job.  She has been embarrassed and humbled before family, friends, and former co-workers.  She now has a felony conviction and is struggling to find employment.  In addition, the government seeks $109,000 in restitution for money Ms. Jasper never saw, a significant financial burden Ms. Jasper and her husband will carry for the rest of their lives.

Ms. Jasper's upbringing and her family relationships are set forth in PSR ¶¶ 43-51 as well as in the letters to the Court from Ms. Jasper and her family and friends that the defense has already submitted.  Ms. Jasper has no criminal record at all; she had not received so much as a speeding ticket prior to the offense conduct in this case, nor has she since.  Based on the PSR as well as the statements from those who knew her best, the offense conduct in this case was a significant aberration in a life that has otherwise been about doing the right thing and helping others.

Notably, the job at OPM was Ms. Jasper's first "real job."  She started at OPM about a year-and-a-half after graduating from Brigham Young University in Hawaii.  PSR ¶ 58.  Ms. Jasper was much younger and had far less experienced (both in general and at OPM in particular) than the other OPM background investigators involved in these cases.

During her time at OPM, Ms. Jasper's workload was high and her job was stressful, but Ms. Jasper recognizes that this does not explain her actions.  In fact, she makes no excuses for

2

her behavior.  Importantly, however, she never intended to cause harm or believed that the short-cuts she took undermined her reports.  She never completely failed to complete an investigation, but instead did not do her job fully.  She now recognizes, however, that doing so put each of her investigations into question.  As set forth in the Acceptance of Responsibility section of the PSR (¶ 27), as well as in her letter to the Court, her criminal conduct has caused Ms. Jasper tremendous shame, heartache, and regret.

Following her voluntary resignation from OPM in October 2011, Ms. Jasper's husband, Carstens Jasper, was also terminated from his employment with an OPM contractor as a result of Ms. Jasper's situation.  See PSR ¶ 49 (stating that Mr. Jasper was terminated "[a]s a result of his wife's criminal activity").  Having uprooted themselves and moved back East so that Ms. Jasper could take the OPM position, they returned to Idaho to live with Mr. Jasper's parents.  While Mr. Jasper has been able to obtain sporadic employment waterproofing/insulating buildings, neither Ms. Jasper nor her husband have been able to obtain full-time employment.

As noted, Ms. Jasper gave birth to a baby girl, Cara, on November 21, 2012.  Her life is currently centered around caring for her daughter and trying to secure the family's future.

**B.      Offense Conduct.**

The offense conduct is set forth in the PSR and will not be repeated here.  Significantly, however, and as reflected in Exhibit 2 of the government's Memorandum In Aid Of Sentencing, Ms. Jasper's case features the very lowest percentage of falsifications of any OPM background investigator case.  Despite re-working 226 of Ms. Jasper's cases, which included 723 sources, the government found only 47 "confirmed falsifications."  When combined with 109 "unable to validates" – which the government concedes involve cases where "testimonies could not be

validated for reasons unrelated to any falsification by defendant" – the "falsification rate" is 21%. Notably, at least two of the three defendants who received probation (Faye Liner, Stewart Chase, and Kim Ocasio) had higher falsification rates (47% and 46%), with Ms. Liner's being unknown for some reason. All of the defendants who received three months in prison (Thomas Fitzgerald, Miccah Dusablon and Bryan Marchand) had higher falsification rates (38%, 27%, and 40%) than Ms. Jasper.

Following OPM's detection of a falsification, OPM investigators placed Ms. Jasper on administrative leave. She was then summoned to an interview with Mr. Kroop and other OPM personnel and interrogated about her conduct. During this interview Ms. Jasper ultimately admitted to falsifying a number of sources and provided a written statement to OPM confessing her guilt. The next thing Ms. Jasper heard about the matter was a target letter from the United States' Attorney's Office. Mr. Jasper voluntarily resigned from OPM in October 2011.

For reasons unknown to the defense, it does not appear that Ms. Jasper was ever given the opportunity to stop the investigation (and thereby dramatically limit the loss and restitution amounts) that Ronald Payton (08-CR-153 (RWR)) and Kim Ocasio (12-CR-119 (JEB)) — both of whom were sentenced to probation — were given.[1] This is all the more perplexing given that

---

[1]     At the time of the plea in this case, the government described this debrief "opportunity" in the following manner:

> If a defendant does come in early and debrief before the recovery effort is complete, then OPM is able to adjust and target certain time periods; however, that did not occur in this case.
> So in a case where the defendant does not come in and debrief and indicate the time period of falsification, what OPM is required to do statutorily as well as by their regulatory rules is go back to a specified time period, and it's generally six months prior to the first falsification that's identified . . . So in this case, the time period that had to be redone was her work between August 2010 and June

Ms. Jasper admitted to the falsifications at the very first meeting she was asked about it, on August 15, 2011.

**C.     The Government's Memorandum In Aid Of Sentencing.**

The government now asks the Court to incarcerate Ms. Jasper away from her family and infant daughter for a period of five months. Such a sentence would needlessly cost the federal government approximately $11,755.90[2], and is not necessary to serve the purposes of sentencing. Driven by a questionable loss amount that seriously overstates the financial harm Ms. Jasper caused, the government's recommended sentence is far greater than what is necessary, placing Ms. Jasper in the exact same category as defendants who intentionally and greedily misappropriated up to $120,000 for their own personal use. In addition. the government's suggestion that five months incarceration is needed to avoid unwarranted disparity via-a-vis other sentences in background investigation cases is based on a very narrow look at the cases, focusing on just three cases in this District, while unconvincingly attempting to distinguish at least eight other cases involving lower sentences, including probation. As set forth below, a broader look at these cases demonstrates that a sentence of probation here is entirely consistent with the

---

2011 or thereabouts. So – so the time period will vary, and, again, this involves open cases as well as closed cases, but it's not the entire time that she was working for OPM. And it's not a more targeted time, because we has not spoken to her . . .

Plea Tr. at 24-25 (Ex. 1).

[2]     This estimate is based on the information released by the Administrative Office of the U.S. Courts, which shows the annual cost of incarceration for FY 2010 to have been $28,284.16. The information is available at http://www.uscourts.gov/News/NewsView/11-06-23/Newly_Available_Costs_of_Incarceration_and_Supervision_in_FY_2010.aspx.

sentences in the other OPM background investigator cases, particularly given Ms. Jasper's

comparatively lower falsification rate.

## DISCUSSION

**I.      THE 3553(A) SENTENCING FRAMEWORK.**

The Court in <u>Booker</u> held that judges are required to "take account of the Guidelines

together with other sentencing factors," and to "<u>consider</u>" the guidelines along with all the other

required factors.  <u>Id.</u> at 259 (emphasis added).  But there is no requirement that a sentence be

within the guidelines range, and a number of other statutory factors, which are mandatory, must

be followed by the court, because section 3553(a) remains in effect and sets forth numerous

factors that guide sentencing.  *Id.* at 261.

Thus, courts are now required to impose a sentence "<u>sufficient, but not greater than</u>

<u>necessary, to comply with the purposes set forth in paragraph (2)</u>" of 18 U.S.C. § 3553(a)

(emphasis added).  These purposes include the necessity for the sentence:

> (A) to reflect the seriousness of the offense, to promote respect for the law,
> and to provide just punishment for the offense;
> (B) to afford adequate deterrence to criminal conduct;
> (C) to protect the public from further crimes of the defendant; and
> (D) to provide the defendant with needed educational or vocational
> training, medical care, or other correctional treatment in the most effective
> manner.

Subsections (A) through (D) of § 3553(a)(2) thus highlight the primary purposes of

sentencing.  <u>See also</u> § 3551 (defendant "shall be sentenced in accordance with the provisions of

this chapter so as to achieve the purposes set forth in subparagraphs (A) through (D) of section

3553(a)(2) . . .").  In determining a sentence consistent with these goals, the Court must consider

a number of other factors as well--<u>see</u> § 3553(a)(1)-(7)--including "the nature and circumstances

of the offense and the history and characteristics of the defendant," the "kinds of sentences available, and "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

## II.    THE SECTION 3553(A) FACTORS AS APPLIED TO THIS CASE.

### A.    Kristen Jasper's History and Characteristics.

Ms. Jasper has never been convicted of a criminal offense of any kind whatsoever.  She committed the offense not for financial gain or to harm anyone.  The OPM job was her first real job, and Ms. Jasper was far younger and less experienced than her colleagues who committed similar misconduct.  As the PSR attests, Ms. Jasper is extremely remorseful for her actions.  Her family circumstances include having a 3-month old baby girl at home, her first, to care for and support.  A sentence involving incarceration would result in the separation of a mother from her infant at a critical stage of her daughter's development.  The defense respectfully submits that these circumstances support a variance from the applicable guideline range down to probation with home confinement.

### B.    The Nature and Circumstances Of The Offense.

For a period of about 10 months, Ms. Jasper told her employer that she had performed background certain interviews or checked certain sources that she had not.  Although there is no indication that anyone who received a security clearance based on an investigation performed by Ms. Jasper (or any other OPM investigator, to counsel's knowledge) was later determined to be unsuitable, Ms. Jasper fully recognizes that her false statements were illegal and had the potential to cause harm.  As noted in the PSR, she takes full responsibility for her actions and is thoroughly remorseful.  The government asserts that it was required to re-work 226 of Ms.

Jasper's cases at a supposed cost of $109,000, which includes the assigned OPM agents' salary,

benefits, and apparently thousands of dollars <u>of OPM agent overtime</u>.  The defense has not been

provided with any discovery concerning how the OPM agents spent their time, what the benefit

payments include, or why costly overtime was necessary.

     C.     **The Advisory Guidelines.**

As set forth in the PSR – and based mostly on the amount of "loss" – the advisory

sentencing range under the Guidelines is 12-18 months, in Zone C of the Sentencing Table.

Recognizing that the alleged loss in these cases bears a poor relationship to culpability, the

government has agreed in this case, and other background investigator cases, to recommend one

month below the "low end" of this Guidelines range, i.e., 5 months of imprisonment, if the

defendant accepts the government's plea agreement.  That plea agreement requires a defense

stipulation as to "loss" and restitution, as well as a waiver of appellate rights.  The plea

agreement permits the defense to seek a sentence outside the Guidelines range, however, "based

upon the factors to be considered in imposing a sentence pursuant to Title 18, United States

Code, Section 3553(a)."  Plea Agreement ¶ 10.

As this Court is aware, the Supreme Court has since <u>Rita v. United States</u>, 551 U.S. 338

(2007), instructed district courts to consider challenges to individual sentencing guidelines on the

grounds that a guideline itself fails properly to reflect § 3553(a) considerations, reflects an

unsound judgment, does not treat defendant characteristics in a proper way, or that a different

sentence is appropriate regardless.  <u>Id</u>. at 351, 357.  Judges "may vary [from guidelines ranges]

based solely on policy considerations, including disagreements with the Guidelines," <u>Kimbrough</u>

<u>v. United States</u>, 552 U.S. 85, 101 (2007) (internal quotation marks omitted).  Here, while §

2B1.1 may ultimately be read to support the government's loss amount (which is one reason the defense stipulated to it), the defense respectfully submits that the Court should reject the resulting loss amount under Rita/Kimbrough as a reasonable basis of approximating the harm in this case. There are several more reliable methods of calculating loss in these cases that would lead not to a Guidelines range of 12-18 months but rather to a sentence of probation with home confinement and whatever other conditions the Court deems appropriate.

1.      The Amount Of Loss.

Under the United States Sentencing Guidelines,

[T]he sentences of defendants conviction of federal offenses shall reflect the nature and magnitude of the loss caused or intended by their crimes.  Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the seriousness of the offense and the defendant's relative culpability and is a principal factor in determining the offense level under [§ 2B1.1].

U.S.S.G. § 2B1.1 (Background).  As the Court is aware, "actual loss" means "the reasonably foreseeable pecuniary harm that resulted from the offense."  Id., application note 3(A)(1) (emphasis added).

Ms. Jasper's conduct was obviously different from the conduct of most defendants who are sentenced based on the "amount of the loss" pursuant to U.S.S.G. § 2B1.1.  Section 2B1.1 is generally applied in larceny, embezzlement, and fraud cases in which the amount of the loss is the amount of financial gain that the defendant sought to unlawfully obtain.  Theoretically, the more the defendant sought to gain, the more blameworthy the conduct and the greater the culpability of the defendant.  Here, however, Ms. Jasper's guidelines are instead driven by the cost of re-doing not only the work she should have done – but the work that she did do and that the government re-confirmed she did do.  The cost the government alleges for re-working 723 of

Ms. Jasper's sources was $109,000.

As noted in the government's Kroop Affidavit, this amount includes each OPM agent's "hourly rate, including benefits," and their travel time.  Kroop Affidavit ¶ 7.  At the plea hearing in this case, the government stated that the Kroop Affidavit would "set[] forth in greater detail how these costs [underlying the loss amount] are calculated."  Plea Tr. at 24 (Ex. 1).  While the Kroop Affidavit does provide somewhat greater detail about the methodology used in these cases, it provides no specific information about the actual costs involved in Ms. Jasper's case, e.g., the agents' hourly rates, or the agents' travel time in this case.  The defense has received no discovery to substantiate the government's $109,000 figure.

Furthermore, although § 2B1.1, application note 3(D)(ii) specifically instructs that loss shall not include "[c]osts to the government of, and costs incurred by victims primarily to aid the government in, the prosecution and criminal investigation of an offense," nowhere does the Kroop Affidavit or the government's sentencing memorandum explain how the OPM agents' contributions to the criminal prosecution of Ms. Jasper are backed out of the loss amount.  The defense respectfully submits that is because they are not.  Indeed, it is the existence of the criminal investigation that provides the best explanation for why the alleged costs of the "recovery effort" so greatly exceed what those services would cost to perform in the first instance.

Based on the government's method of calculating loss, Ms. Jasper's sentencing range increased from a range of 0-6 months to a range of 12-18 months in Zone C.  This places her within the same guideline range as a defendant who stole up to $120,000 for his own personal gain or who misappropriated that much money simply to support a lavish lifestyle.

10

When utilized in the above manner, § 2B1.1 does an exceptionally poor job of capturing the financial harm in these cases. That is readily apparent from the existence of numerous alternative methods of calculating loss that are more logical and better capture the financial harm created by Ms. Jasper's conduct. The defense suggests two such alternatives for calculating loss below that are equally or even more consistent with § 2B1.1 and that better capture the financial harm in this case.

a.      **The Real World Cost Of OPM Record Checks/Interviews.**

One way of capturing the value of the services that Ms. Jasper did not provide (47 alleged sources) – as well as the services that she did provide and that the government has re-confirmed she provided but is still charging her for both in the loss amount and restitution (at least 568 cases (723 - 47 confirmed falsifications - 108 sources with "indicators")) – would be to look at what OPM actually pays people to provide these services. Indeed, basic economic theory would dictate that relying on how the investigators' services are actually valued in the real world would be the optimal way to quantify the loss in these cases.

As part of discovery in a related OPM case, the defense obtained Exhibit 2, which is a Consulting Investigative Services Agreement (Addendum) for consultants OPM hired to conduct background investigations between 2006 -2008, the same time period Ms. Jasper commenced working at OPM (January 7, 2008).[3] As reflected on page 3, the compensation (and therefore OPM's cost) for background investigations is based on a point system. For each record check and reference interview – the two kinds of sources at issues in this case – OPM credits its consultants with 1 point. The background investigators are paid $35 per point. In addition, the

---

[3]      Exhibit 2 is redacted to remove names and addresses.

investigators are paid .25 point for every 15 miles traveled.  Notably, "report writing" is

accounted for in the point compensation system and cannot be separately invoiced.

When the above pricing structure is applied to this case, the cost (less travel) to OPM of

re-working 723 sources – the number re-worked in this case – is only $25,305 ($35 x 723).

While travel and (perhaps) other administrative expenses might increase this amount marginally,[4]

it is still far below the numbers produced under the government's method of accounting for loss.

Indeed, under the government's method, OPM's cost for each record check/interview is at a rate

of approximately $150 per source ($109,000/723).  That is well over 4 times greater than how

OPM values (and what it pays for) these services in the real world.

**b.      What Ms. Jasper Was Paid.**

As an entry-level background investigator, Mr. Jasper's compensation was a salary of

approximately $58,000 per year at its greatest.  See PSR ¶ 70 (noting Ms. Jasper's annual income

while at OPM).  The falsifications in this case were scattered throughout a time period of ten

months.  Id.  Even assuming that every case with a "falsification indicator" was in fact falsified,

and that Ms. Jasper's true falsification rate was therefore the 21% the government posits, 21% of

$58,000 is only $12,180.  It should be undisputed that this is the highest possible amount of Ms.

Jasper's ill-gotten gains.  And backing out the fair market value of services rendered is required

under § 2B1.1.  See application note 3(E) ("Credits Against Loss") ("Loss shall be reduced by . .

. the fair market value of . . . the services rendered, by the defendant . . . to the victim before the

---

[4]      Notably travel expenses cannot come close to substantiating the $109k claimed by the government.  To make up the $85k difference between the claimed loss amount and the $25k, the re-do investigators would have had to invoice almost 146k miles of travel (i.e., 200 miles per record check/interview).

offense was detected.").

Citing unspecified OPM regulations, the government will respond that because there was evidence of a small number of falsifications, it needed to re-work a much larger number in order to ensure the integrity of all of Ms. Jasper's investigations.  As an initial matter, it seems highly unlikely that the OPM agents' re-working of the cases did not rely at least in some part on the work Ms. Jasper had previously (and most often correctly) performed.[5]  But in any event, there is no logical explanation for why re-working even all of the cases Ms. Jasper was assigned over a ten month period would cost more than the $58,000 that OPM was paying in annual salary for an investigator of Ms. Jasper's experience.  Nowhere does the government explain why re-working a case should cost more than working a case the first time; indeed, common sense suggests it would cost less – unless the OPM agents' work also involved "[c]osts to the government of, and costs incurred by victims primarily to aid the government in, the prosecution and criminal investigation of an offense," U.S.S.G. § 2B1.1, application note 3(D)(ii), which are costs the Guidelines expressly disallow.

### D.    The Need To Avoid Unwarranted Sentence Disparities Among Defendants With Similar Records Who Have Been Found Guilty Of Similar Conduct.

As discussed, the sentence of probation that Ms. Jasper requests is consistent with the sentence that the majority of other similarly situated defendants have received, particularly given

---

[5]    The government's explanation at the plea hearing in this case supports the defense's belief that re-working Ms. Jasper's cases should actually cost _less_ than her salary – not more.  At the plea hearing, the government stated that new reports needed to be written only where "discrepancies are found and falsifications are found."  Plea Tr. at 23 (Ex. 1).  Thus, in the vast majority of Ms. Jasper's cases, no new reports needed to be written.  It is therefore all the more perplexing that the amount of loss should so dramatically exceed what OPM agents are paid to perform the work the first time.

the lower falsification rate present here.  See Security-Clearance Checks for OPM Allegedly Falsified, The Washington Post, April 9, 2009 (noting that "most" investigators charged with making false statements have received probation).  Undersigned counsel has located eleven similar prosecutions that have occurred since 2007.[6]  With one exception, these individuals have received sentences that range from probation to five months incarceration.  The one exception is an outlier because the defendant was sentenced to 27 months after he denied responsibility and was found guilty by a jury.  Furthermore, he not only falsified background checks but also made false representations in a subsequent job application.  See United States v. George Abraham, 08-CR-153 (CKK) (sentenced on seven counts of making false statements to 27 months incarceration and 36 months of supervised release; convictions later vacated due to defendant's death).  Of the remaining ten cases, only three investigators received terms of incarceration as severe as the government seeks here (five months), one received a sentence of four months, three received a sentence of three months, one received a sentence of two months, and five received sentences that did not include a term of incarceration.  See United States v. Suzanne Weeks, 09-CR-033 (PLF) (sentenced to 5 months incarceration and 5 months home detention and ordered to pay $101,180.48 in restitution); United States v. Nathaniel Walker, 09-CR-274 (CKK) (same, with $61,405.32 in restitution); United States v. Anthony Domico, 09-CR-280 (RWR) (same, with $69,611.12 in restitution); United States v. Catherine Webb, 11-CR-049 (RWR) (sentenced to 4 months' incarceration, with $73,293.63 in restitution); United States v. Thomas Fitzgerald, 11-CR-017 (RBW) (sentenced to 3 months' incarceration and 12 months home detention and

---

[6]     This information was gathered from the government, media sources and several Assistant Federal Defenders in other jurisdictions.  Counsel does not have a means of determining the exact number of such investigators prosecuted.

ordered to pay $106.711.81 in restitution and perform 400 hours of community service); United States v. Miccah Dusablon, 11-CR-359 (RBW) (sentenced to 3 months' incarceration and 200 hours community service); United States v. Kerry M. Gerdes, 09-CR-20289 (E.D. Mich.) (sentenced to 2 month incarceration and 6 months electronic monitoring and ordered to pay $24,555.00 in restitution); United States v. Faye Liner, 10-CR-026 (HHK) (sentenced to probation with 12 months home detention and ordered to pay $68,461.20 in restitution); United States v. Mario A. Marsans, 07-CR-578 (D. Md.) (sentenced to three years probation with 10 months of electronic monitoring and ordered to pay $101,032.00 in restitution and perform 100 hours of community service); United States v. Ronald G. Payton, 08-CR-153 (CKK) (sentenced to probation with 6 months of location monitoring and 20 hours of community service and ordered to pay $10,000 in restitution); United States v. George J. Dittman, 08-CR-226 (D. Conn.) (sentenced to three years probation and ordered to pay $21,239.00 in restitution and perform 200 of community service); United States v. Donald Lerch, 10-CR-264 (EGS) (sentenced to two years probation).[7]

Thus, while the government correctly notes that three investigators who entered guilty pleas back in 2008-2009 received sentences equivalent to the sentence the government seeks here, its suggestion that this sentence is the norm in these cases, see Gov't Sent. Mem. at 12, is simply incorrect.  Furthermore, all of those individuals – as well as the ones who received less

_____

[7]      In addition to the listed cases, there have been two prosecutions of individuals who were record searchers and submitted false reports in relation to background investigations. Presumably because of their lower level of responsibility with regard to the investigations – although the potential damage from their false statements was similar to that of those listed above – these individuals were permitted to enter guilty pleas to misdemeanor offenses and received sentences of probation.  See United States v. Kayla Marie Smith, 09-M-252 (AK); United States v. Paul Higgins, 08-M-698 (AK).

time, including probationary sentences — had higher falsification rates than Ms. Jasper.  Most also did not have the same family circumstances Ms. Jasper has.

In addition, it should be noted that the <u>Domico</u> case differed entirely from Ms. Jasper's case because the defendant was a contract worker who was paid according to how many investigations he completed and was motivated by greed – the more reports he completed (by saying he completed work that he had not completed), the more money he received.  <u>See</u> <u>Domico</u>, 09-CR-280 (RWR), Dkt. #13.  Ms. Jasper was paid in salary.  Moreover, there have been three cases in this District, <u>Liner</u>, <u>Payton</u>, and <u>Lerch</u>, and two cases in other Districts, <u>Dittman</u> and <u>Marsans</u>, in which the defendants were sentenced to probation, with no term of incarceration.  Ms. Jasper's case most closely resembles that of <u>Liner</u>, who was a Special Agent of OPM, like Ms. Jasper, and received a sentence of probation with home detention, in part because she, like Ms. Jasper, was needed in the home to care for her child.  Indeed, it appears that the only difference between <u>Liner</u> and this case is the fortuitous one that the government made contact with Ms. Liner early in its investigation.

> **E.      The Purposes of Sentencing.**

Given Ms. Jasper's history and lack of intent to cause harm, a sentence that does not involve a period of incarceration would be sufficient to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, and afford adequate deterrence to criminal conduct.  Ms. Jasper's prosecution for this offense has had a tremendous impact on her and she fully recognizes the damage that she has done.  In addition, as a result of her conduct, she now has a felony conviction.  This conviction will have significant consequences on Ms. Jasper for the rest of her life – most tangibly, by severely limiting her

employment opportunities, but also by forever being branded as a felon in society's eyes.

No period of incarceration is necessary to protect the public from Ms. Jasper – there will be no future crimes.  The effect that this case has had on her life (and the potential effect on the life of her baby daughter) – absent any period of incarceration – is sufficient to guarantee that she will never commit another offense.  Moreover, as the United States Sentencing Commission has recognized, defendants without any prior contact with the criminal justice system are unlikely to recidivate.  See United States Sentencing Commission, Recidivism and the "First Offender," A Component of the Fifteen Year Report on the U.S. Sentencing Commission's Legislative Mandate (May 2004) (noting that offenders with no prior arrests or convictions have the lowest recidivism rate).

Nor is a sentence of incarceration necessary to deter others.  Ms. Jasper has and will continue to be punished for her conduct.  To the extent background investigators will be deterred by the convictions and sentences of others, Ms. Jasper's felony conviction, restitution paid for the government's alleged cost of redoing the investigations, job loss, damaged reputation, along with the negative effects on her family and her ability to obtain employment, would sufficiently deter any similarly situated individuals.  Moreover, the conviction of numerous background investigators (regardless of whether a jail sentence was imposed) and the publicity surrounding these convictions have already communicated the deterrence message to the public generally and the OPM investigator community in particular.  See, e.g., Top Secret Clearance Checks Falsified, The Washington Times, June 21, 2011, available at www.washingtontimes.com/news/2011/jun/21/top-secret-clearance-checks-falsified; Security-Clearance Checks for OPM Allegedly Falsified, The Washington Post, April 9, 2009.

F.      **The Kinds of Sentences Available.**

Here, rather than imposing a period of incarceration, the Court can and should impose a substantial period of probation or supervised release with significant conditions, such as home confinement with electronic monitoring and community service.  A sentence of supervised release (or probation) itself is a "substantial restriction of freedom."  Gall, 128 S. Ct. at 595 (citation omitted).  As the Supreme Court has explained:

> We recognize that custodial sentences are qualitatively more severe than probationary sentences of equivalent terms.  Offenders on probation are nonetheless subject to several standard conditions that substantially restrict their liberty.  See United States v. Knights, 534 U.S. 112, 119, 122 S. Ct. 587, 151 L.Ed.2d 497 (2001) ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled' " (quoting Griffin v. Wisconsin, 483 U.S. 868, 874, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987))).  Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court.  They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking.  U.S.S.G. § 5B1.3.  Most probationers are also subject to individual "special conditions" imposed by the court.

Id. at 595-96 (footnote omitted).

Home detention and community service are alternatives to incarceration that are just forms of punishment in light of Ms. Jasper's lack of criminal record, background and family circumstances.

G.      **The Need to Provide Restitution to Any Victims of the Offense.**

As noted above, Ms. Jasper has agreed to pay $109,000 in restitution – about twice the amount of her full annual salary for the time period in which the offense conduct occurred – in

18

this case.

## **CONCLUSION**

For all of the foregoing reasons and such other reasons as may be presented at the

sentencing hearing, the Court should impose a sentence that substitutes a term of home

confinement with electronic monitoring for any term of incarceration, plus restitution and

community service.

Respectfully submitted,

_____/s/_____

Jonathan S. Jeffress
Assistant Federal Public Defender
625 Indiana Avenue, N.W.
Suite 550
Washington, D.C. 20004
(202) 208-7500, ex. 134