**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Crim. No. 12-CR-163 (BAH)** |
| | : | |
| **KRISTEN M. JASPER,** | : | |
| **Defendant.** | : | |
| _____ | : | |

### GOVERNMENT'S REPLY MEMORANDUM IN AID OF SENTENCING

The United States of America, by and through its attorney, the United States Attorney for

the District of Columbia, submits this reply memorandum in aid of sentencing.[1]  In Defendant's

Memorandum in Aid of Sentencing ("Jasper Memo"), defendant does not deny that she falsified

reports of national security background investigations and that her offense is a serious one.  See,

e.g., Jasper Memo at 7 ("Ms. Jasper fully recognizes that her false statements were illegal and

had the potential to cause harm.").  Rather, defendant argues, inter alia, that the loss calculation

in this and other background investigator cases is "highly questionable" and "seriously

overstates the financial harm Ms. Jasper caused" and that her conduct "was far less egregious

than" the conduct of those background investigators who received terms of imprisonment (Jasper

Memo at 1, 5, 11).  Defendant also argues that the Court should show her leniency because of

her relative youth and inexperience, her family circumstances, and her purported similarity to

other defendants who received no jail time for their offenses (Jasper Memo at 1, 7, 16).

Defendant's arguments lack merit.  As explained infra, defendant's arguments concerning the

_____

[1]This reply memorandum also addresses the Court's notice to the parties, dated 2/4/13,
that the Court is contemplating a downward departure from the applicable advisory guideline
sentencing range under U.S.S.G. § 2B1.1, n.19(C).

loss calculation are based on faulty assumptions, and her arguments concerning her relative

culpability are based on misleading comparisons.  Furthermore, defendant's arguments fail to

account for her extensive training and experience and full knowledge of the potentially

catastrophic consequences of her criminal behavior for our national security.  In order to avoid

unwarranted disparities with other defendants who were truly similarly situated to the instant

defendant, the government has agreed to a maximum sentence that is slightly below the

Guidelines range of 12-18 months.[2]  However, the government respectfully submits that only a

sentence that includes jail time would adequately promote the goals of 18 U.S.C. § 3553(a)

under the circumstances of this case.

I.      **The loss calculation and resulting Guidelines range adequately reflect the
        seriousness of the offense.**

After stipulating to the loss amount of $109,000 as part of the plea agreement and

conceding that "[U.S.S.G.] § 2B1.1 may ultimately be read to support the government's loss

amount," the defense now argues that "§ 2B1.1 does an exceptionally poor job of capturing the

financial harm in these cases" (Jasper Memo at 8-9, 11).  Defendant's arguments are wrong-

headed in several fundamental respects.  The loss amount in this case does accurately reflect the

financial harm to the government caused by defendant's offense conduct.

---

[2]Defendant argues that the government agreed to allocute for five months of incarceration
followed by five months of home detention because the government "recogniz[es] that the
alleged loss in these cases bears a poor relationship to culpability" (Jasper Memo at 8).  This is
false.  The government agreed to allocute as set forth above because it recognizes that once the
recovery costs rise above a certain level (e.g., $70,000), the differences between, for example,
$75,000 and $110,000 may be as reflective of regional differences in the cost of living or traffic
congestion as they are reflective of differences in levels of culpability or acceptance of
responsibility.

A.      Defendant falsified her reports for financial gain.

First, defendant argues that she committed these offenses "not for financial gain" and that her conduct was therefore "obviously different from the conduct of most defendants who are sentenced" pursuant to § 2B1.1 (Jasper Memo at 7, 9).  However, the evidence strongly suggests that defendant falsified in order to get the job done more quickly and thereby maintain her job, salary, and lifestyle.

On August 9, 2010 - the same month as her first confirmed falsification – defendant was notified by the U.S. Office of Personnel Management's ("OPM") that she was being given a 90-day opportunity period to improve her performance from "Unacceptable" to "Minimally Successful (MS)" in the element of timeliness (see Memorandum from Dustin to Jasper, dated November 17, 2010, Exhibit A hereto).  At the end of that 90-day period, she was informed that although her performance remained at an "Unacceptable" level, she had "made some improvements" during her opportunity period, and thus her opportunity period was being extended until December 31, 2010, "to provide [her] with additional time to improve [her] performance" (id.).  The memorandum noted that "[f]ailure to improve [her] performance to the MS level" in the element of timeliness could result in "removal, reassignment, or reduction-in-grade" (id.).

On January 24, 2011 - after she had been falsifying Reports of Investigation ("ROI's") for approximately five months - defendant was notified that "[her] efforts" had "resulted in improved performance to the MS level in the critical element of Timeliness" (see Memorandum from Dustin to Jasper, dated January 24, 2011, Exhibit B hereto).  The memorandum noted that she "must continue to perform at least at an MS level of performance in the critical element of

Timeliness for at least one year form August 9, 2010" (id.).

On January 31, 2011, defendant was informed that she was being denied a routine Within-Grade Increase in pay ("WIGI") due to her "Unacceptable" performance in the element of timeliness and her "Minimally Successful" performance in the elements of quality, productivity, and investigative competencies (see Memorandum from Dustin to Jasper, dated January 31, 2011, Exhibit C hereto).  The memorandum noted that if her performance improved and she "demonstrated sustained performance that equates to a FS [Fully Successful] level" within the next 52 calendar weeks (i.e., through August 2011), she would be granted her WIGI (id.).  Defendant's falsifications continued through June 2011, when she was placed on paid administrative leave.[3]

A reasonable inference from this evidence is that defendant began falsifying in order to raise her timeliness and productivity to the level needed for her to avoid removal or demotion and that she continued falsifying in order to keep her job and perhaps even receive a pay increase.  Defendant conceded to the PSR writer that she started falsifying "due to extreme pressure and stress to keep my job" and that she was under the "ever looming threat of being fired" (PSR ¶ 27).  By falsifying interviews and record checks, defendant was able to close her cases more quickly, improve her timeliness and productivity statistics, obtain a better evaluation, keep her job, and have a chance at receiving a performance-based pay increase that had

---

[3]Like Jasper, former OPM-FIS Special Agent Catherine Webb, who received a four-month prison term, falsified her ROI's after being denied a WIGI in pay.  Both Jasper and Webb chose to "fix" their documented performance problems through falsification, rather than working harder or finding a new job.

previously been denied to her – all at the expense of our national security.[4]  Her disregard of our

national security for her own financial gain arguably warrants a harsher punishment than the

conduct of defendants who simply misappropriate funds for their own personal gain.

      B.     OPM's loss calculation is sound.

Despite the fact that seven different judges in this district, as well as federal judges in

other jurisdictions, have accepted and approved OPM's calculation of loss in these background

investigator prosecutions, defendant argues that OPM's loss calculation is "questionable" and

"seriously overstates the financial harm Ms. Jasper caused" (Jasper Memo at 5).  These

arguments are without merit.

First, without any basis, defendant questions whether reworking 226 cases submitted by

defendant was truly required, stating that the government "asserts" that it was required to do this

based on "unspecified OPM regulations" (Jasper Memo at 7, 13).  As explained by Special

Agent Kroop in his initial affidavit in this matter (Dkt. No. 15-1), the discovery and confirmation

of a falsification by defendant in one of her ROI's required OPM's Federal Investigative

Services ("OPM-FIS") to undertake a full recovery effort.  In fact, OPM's Standard Operating

Procedures ("SOPs," attached hereto as Exhibit D) clearly state: "As standard procedure,

investigative work that the investigator completed six months prior to admission of falsification

---

[4] In this important respect, defendant's case is far from unique.  In none of the cases involving background investigators who falsified has there been evidence to suggest that the investigator falsified out of malicious intent or a desire to hurt her government or her country. Jasper Memo at 3 ("she never intended to cause harm").  To the contrary, the motive in all of these cases - contractors and federal employees alike – appears to have been a combination of financial gain and lack of desire to put in the time required to conduct these national security background investigations properly.  Just as in the instant case, the previous background investigator defendants had "no criminal record," lived an otherwise upstanding life, and posed no threat of recidivism.  Jasper Memo at 2, 17.

(either through an inquiry or admission of falsification) will be identified and sent to the field for validation." OPM also is required to rework all open cases. Accordingly, for this defendant, since OPM's initial investigation revealed falsification in December 2010, OPM went back six months and reworked a total of 226 cases from June 2010 until the time when defendant was placed on administrative leave, i.e., June 2011.

Next, defendant questions - again without any basis - the "supposed cost of $109,000"[5] for OPM-FIS to rework 226 cases and asserts that the total cost should be lower than "what those services would cost to perform in the first instance" (Jasper Memo at 10, 13). Defendant's argument is wrongheaded in myriad ways. The government's loss calculation is actually quite conservative, as demonstrated infra.

First, as noted in the PSR (p. 21), the final cost of the recovery effort was actually a bit higher, specifically $117,980.77. For the sake of getting defendant to resign sooner rather than later and thereby saving taxpayers the cost of her paid administrative leave, the government agreed to cap the loss amount at the total recovery cost as of 9/24/11, which was $109,000. Thus, the government gave her the benefit of that bargain by not using the slightly higher $117,980.77 figure.[6]

_____

[5]Defendant states that the defense "has received no discovery to substantiate the government's $109,000 figure" and "has not been provided with any discovery concerning how the OPM agents spent their time, what the benefit payments include, or why costly overtime was necessary" (Jasper Memo at 8). Defendant fails to note that on 10/15/12, the government sent the defense and the USPO via email a breakdown of the recovery costs (attached hereto as Exhibit E) and that at no time since 10/15/12 has the defense asked the government for any further breakdown or explanation of these costs.

[6]Defendant complains that she was "[n]ever given the opportunity to stop the investigation (and thereby dramatically limit the loss and restitution amounts)" that Payton and Ocasio were given (Jasper Memo at 4). This is simply untrue. During the government's initial

Second, the number of hours worked and charged to the Jasper recovery effort was fairly comparable to the number of hours spent on these cases in the first place.  The recovery covered defendant's work from June 21, 2010, through June 9, 2011.  During that time, defendant worked approximately 1,978 hours, excluding holiday and leave hours (see Exhibit F, which is a summary of defendant's work hours, pay, and benefits during the time period June 21, 2010, through June 9, 2011, excluding holiday and leave time).  According to the recovery cost worksheet (Exhibit E), a total of 2,138 hours were spent on the Jasper recovery project, including administrative time.  Administrative recovery work included "reviewing each case, scheduling new field work, reviewing recovery fieldwork, correcting OPM's files to remove or replace inaccurate reports, and preparing the corrected cases for delivery to the requesting agencies." Kroop Aff. (Dkt No. 15-1) ¶ 7.  Spending 2,138 hours to redo approximately 1,978 hours worth of investigator work is quite reasonable; indeed, it is downright efficient, considering that the 2,138 hour total properly includes administrative time associated with correcting defendant's work.  In contrast, the 1,978 hour total only reflects defendant's work time, not the additional time spent by administrative personnel on her cases in the first instance.  Such initial administrative work included reviewing each case, scheduling field work, and preparing cases for delivery to the requesting agencies.  If there were a way to calculate and add in that initial administrative work (which, unlike administrative recovery work, is not tracked and associated with particular investigators' cases), the total number of hours would likely be closer to the

---

conversation with defendant's prior counsel on 9/15/11, the government made clear its desire for defendant's immediate resignation.  At that time, the government was prepared to cap the loss amount at $50,000, which was the accrued recovery cost as of 8/18/11.  Unfortunately, defendant chose to remain on the government payroll until 10/25/11.

recovery project total.

Third, the overall cost of the 2,138 hours of recovery work - $117,980.77 - was comparable to the cost of defendant and her administrative colleagues working on these 226 cases in the first instance.  For her approximately 1,978 hours of work from June 21, 2010, through June 9, 2011, defendant was paid a total of $79,357.54 in salary and benefits (see Exhibit F).  If there were a way to calculate and add in the cost of the initial administrative work on her cases, the total cost would likely be closer to the recovery project total cost.

At a minimum, it is clear that, contrary to defendant's assertion, the recovery costs do not "so greatly exceed what those services would cost to perform in the first instance" (Jasper Memo at 10, 13 n.5).  Defendant arrives at her faulty conclusion by making comparisons that are simply not valid.  For example, defendant suggests that a valid measure of the cost of defendant's work for OPM in 2010-2011 are the payments by a former OPM contractor (ManTech MSM Security Services, Inc.) to its contract investigators in 2006-2008 (Jasper Memo at 11-12).  This is ludicrous on many levels.  First, the time periods are different; the recovery effort looked at Jasper's work in 2010-2011, not 2006-2008.  Second and more importantly, the amount paid by ManTech to its consultants was not the actual cost to OPM.  OPM paid ManTech a set rate for each case, and, as would be expected, ManTech paid a significantly lower rate to its contractor staff.  So, defendant is essentially comparing apples and oranges.  As noted supra, the more accurate comparison is defendant's salary and benefits plus the cost of initial administrative work associated with her cases versus the total recovery cost.

 Indeed, although the recovery cost here does not greatly exceed the initial cost, there are reasons why the recovery cost should be higher than the initial cost.  One reason is overtime.

Defendant questions "why costly overtime was necessary" in the recovery effort (Jasper Memo at 8). Defendant's question reflects a fundamental misunderstanding of how background investigations and recovery efforts are conducted. OPM field staff routinely work overtime, in order to meet Congressionally mandated time lines as well as internal deadlines. Overtime is even more necessary in the context of a recovery project because of the danger that someone obtained a security clearance to which he or she was not entitled due to an investigator's falsifications. The only exception to the general rule that field staff work overtime is that investigators who receive a rating of less than Fully Successful, like Jasper, generally are not given overtime. This is one factor that could lead to the cost of the recovery work exceeding the cost of defendant's work.

A second reason why the cost of the recovery should exceed the cost of the initial work is travel time. OPM-FIS does not include the cost of Temporary Duty ("TDY") (i.e., travel, lodging, and per diem expenses) in its recovery loss calculation, even though TDY is routinely utilized during recovery projects. However, drive time between leads or sources is included. Since defendant clearly did not travel to at least some of her falsified sources, drive time would be one factor that could lead to the cost of the recovery work exceeding the cost of defendant's work.

A third reason why the cost of the recovery should exceed the cost of the initial work is that it is cheaper and more efficient to do an investigation right the first time than it is for other individuals to go back, try to reconstruct, and redo someone's work that was not done properly. For example, falsified interview write-ups often contain incorrect names or addresses, which make it more difficult to track down the source and interview him/her. In addition, recovery

agents are not only required to re-interview every source that defendant represented that she interviewed and redo every record check,[7] but upon learning that a source was never interviewed and does not even know the subject, a recovery agent is required to track down an additional source who does know the subject, interview that new source, and write up that interview in a ROI.  This would obviously require more time (and cost) than defendant originally put in.  Thus, although the defense opines that "common sense suggests [re-working a case] would cost less" (Jasper at 13), the truth is exactly the opposite.  See Supplemental Affidavit of Philip W. Kroop ("Supp. Kroop Aff."), Exhibit G hereto, ¶ 2.

Fourth, as mentioned supra, the cost of the recovery should exceed the cost of the initial work by Jasper because the recovery costs include not only the time and benefits of the agents who re-interviewed the sources but also the time and benefits of the administrative personnel who reviewed each case, scheduled new field work, and corrected OPM's files, inter alia (Dkt. No. 15-1, Kroop Aff. ¶ 7).  Such additional tasks by administrative personnel were necessitated by defendant's falsifications, and accordingly the costs of such tasks fall squarely within the definition of "loss" under § 2B1.1.  So, in reality, the most relevant comparison is defendant's salary and benefits plus the salary and benefits of administrative personnel who worked on defendant's cases initially versus the total recovery cost in the same time frame.  By this

---

[7]Defendant quotes the government's statement that new ROI's need to be written only where discrepancies or falsifications are found by a recovery agent and then leaps to the unwarranted conclusion that no paperwork by the recovery agent is otherwise required (Jasper Memo at 13 n.5).  This is untrue.  Every recovery interview and record check by a recovery agent must be documented on a recovery tracking spreadsheet so that OPM-FIS has a record of the rework and validation process.  Where falsifications or other reportable issues are found, a Memorandum to the File must be prepared as well as a new ROI writeup of that interview or of an interview with a better source.  Supp. Kroop Aff. ¶ 2.

comparison, the recovery cost and the initial cost would be more comparable.  If initial administrative costs are not included in the comparison, then the recovery costs would inevitably exceed the cost of solely defendant's work.

Defendant's further contention that OPM's total recovery cost is so high because it includes criminal investigative costs in contravention of § 2B1.1, application note 3(D)(ii), is similarly without any basis (Jasper Memo at 10, 13).  The recovery costs include no time that any OPM Office of the Inspector General ("OPM-OIG") agent spent on the Jasper investigation and not even any time that OPM-FIS Special Agent Kroop spent on the Jasper matter (even though the inclusion of some of Kroop's time could easily be justified as unrelated to the criminal investigation).  See Supp. Kroop Aff. ¶ 3.  As Special Agent Kroop explains in his supplemental affidavit, all of the time charged to the recovery effort was directly attributable to the reworking and correction of defendant's reports, which must be done – regardless of any potential for criminal prosecution – in order to ensure the accuracy of defendant's reports and thereby protect our national security.  Thus, all of the recovery costs would have been incurred even if there had been no prospect or thought of criminal prosecution.  See Supp. Kroop Aff. ¶ 4. Accordingly, defendant's statement that "nowhere does the Kroop Affidavit or the government's sentencing memorandum explain how the OPM agents' contributions to the criminal prosecution of Ms. Jasper are backed out of the loss amount" (Jasper Memo at 10) is based on a false premise.  There is nothing to "back out" since criminal investigative expenses were never part of the recovery cost calculation in the first place.

Not only does defendant make faulty cost comparisons, but she seems to suggest that she should only be responsible for the cost of redoing the cases that turned out to be falsified and that

§ 2B1.1, n.3(E) supports this argument (Jasper Memo at 12).  Defendant is again mistaken.

After confirming even a single falsification in defendant's work, the only way that OPM-FIS

could ensure the accuracy and integrity of any of defendant's work was to redo all of the

interviews and record checks.  To suggest that OPM-FIS should bear any of the cost of redoing

defendant's work under these circumstances is grossly unfair.  It is also contrary to the

Guidelines.  Application note 3(E) of § 2B1.1, cited by defendant, assumes that the "services

rendered" to the victim by the defendant have some value.  However, the fair market value of

background investigation reports by an investigator who falsified an interview or record check is

zero (before a full recovery effort is undertaken).  Therefore, application note 3(E) requires no

deduction from the stipulated loss amount of $109,000.  <u>See</u> <u>United States v. Byors</u>, 586 F.3d

222, 226 (2d Cir. 2009) (declining to offset any legitimate expenditures against the loss because

"Byors's expenditures, legitimate or not, conferred nothing of value and no benefit on his

victims").  Furthermore, defendant arguably did some of her work properly in order to delay

detection of her false representations and thereby perpetuate her falsification scheme.  Under

these circumstances, application note 3(E) requires no reduction of the loss amount.  <u>See</u> <u>United</u>

<u>States v. Mitan</u>, 2012 WL 4320424, *6 (3d Cir. Sept. 21, 2012) ("perpetrators of fraudulent

schemes are not entitled to credits against loss for payments that were made to perpetuate their

schemes").

        For all of the aforementioned reasons, the $109,000 recovery cost - to which the defense

stipulated as part of the plea agreement - is reasonable and fair and adequately reflects the

seriousness of the offense in this case.

II.     **Defendant should be sentenced to 5 months in prison.**

Even while stating that she is "extremely remorseful" and "makes no excuses for her behavior" (Jasper Memo at 2-3), defendant gives excuses for her conduct that simply do not fit the facts.  For example, defendant's memorandum states that:

> she never intended to cause harm or believed that the short-cuts she took
> undermined her reports.  She never completely failed to complete an investigation,
> but instead did not do her job fully.  She now recognizes, however, that doing so
> put each of her investigations into question.

Jasper Memo at 3.  However, defendant fails to explain why, after her extensive training, which included specific admonitions never to falsify and warnings about criminal prosecution for such behavior, she only now has realized that falsifying was wrong.[8]  Her claim that she was unaware of the potential consequences that could flow from her falsifications is belied by the fact that from June 8-12, 2009, defendant attended an All Hands Training Seminar in Minneapolis, Minnesota (see defendant's travel voucher, attached hereto as Exhibit H), during which all attendees participated in an approximately two-hour-long session entitled "Ethics, Integrity and Administrative Overview."  A significant portion of this session focused on the types of falsifications that had been discovered in ROI's and the consequences of committing such offenses.  See "Falsification" from "Ethics, Integrity and Administrative Overview" Power Point at 21-31, attached hereto as Exhibit I.  During this session, the attendees heard about former background investigators Suzanne Weeks, Ronald Payton, Mario Marsans, and George

---

[8]Defendant also tries to argue that she "was much younger and had far less experience . . . than the other OPM background investigators involved in these cases" (Jasper Memo at 2). This is not true.  Payton was only 24 years old when he falsified, Dusablon was 26 or 27, and Gerdes was 26 or 27.  Yet Dusablon and Gerdes received jail sentences, and Payton only avoided jail time because he took responsibility for his conduct extremely early.

Abraham, all of whom had been criminally prosecuted for falsifying investigative case work.  Id.

at 25-31.  All attendees of the Minneapolis training also participated in a session about OPM's

OIG during which the OIG's role in investigating falsifications by background investigators as

well as specific cases were discussed.  All 47 of defendant's confirmed falsifications occurred

after she attended the Minneapolis training.  Thus, it is disingenuous for defendant to contend –

as she does on p.3 of her sentencing memo – that at the time of her falsifications, she did not

recognize that her "short-cuts" called each of her investigations into question.

     In her memo, defendant attempts to minimize her crimes by stating that OPM found

"only 47 'confirmed falsifications'" and that her "falsification rate," as she calls it, compares

favorably with that of other background investigators who falsified (Jasper Memo at 3-4).

Defendant fails to point out that 47 confirmed falsifications – i.e., unequivocal denials by 47

sources that they were interviewed or provided a record – is one of the highest confirmed

falsification totals among the background investigators who have been convicted of falsification.

See Dkt. No. 15-2.  Only Domico, Chase, and Marchand had higher confirmed falsification

totals, and Domico and Marchand were sentenced to 5 months in prison and 3 months in prison,

respectively.  Moreover, defendant had more confirmed falsifications than Abraham, Weeks,

Walker, Liner, Fitzgerald, Webb, and Dusablon, all of whom were sentenced to prison time

except Liner.[9]  Defendant's attempt to manipulate the statistics in order to minimize her

culpability seems to call into question her statements of remorse for her wrongdoing.

---

[9]This seems to argue for a prison sentence for defendant in order to avoid unwarranted
sentencing disparities.  It should also be noted that defendant's 21% "falsification rate," as she
calls it, is exactly the same overall combined percentage that Weeks had, and Weeks received a
sentence that included five months in prison.

In addition, defendant argues that she should receive a sentence of probation because such a sentence would be "consistent with the sentence that the majority of other similarly situated defendants have received." Jasper Memo at 13. Defendant is wrong on the facts. The majority of background investigators who pled guilty pre-indictment (Weeks, Walker, Domico, Fitzgerald, Webb, Dusablon, Marchand, and Gerdes) have received jail time. The others were not similarly situated to the instant defendant, as explained in the government's initial sentencing memorandum (Dkt No. 15).[10]

Furthermore, defendant attempts to distinguish her case from that of Domico, who was sentenced to five months of incarceration and five months of home detention, by arguing that as a contract investigator Domico was motivated by greed, but as an OPM Special Agent defendant

---

[10]From outside this jurisdiction, defendant cites the case of Donald Lerch as an example of a background investigator who pled guilty pre-indictment and received a sentence of probation. Jasper Memo at 15. But Lerch was not a background investigator. He was a security specialist, who was responsible for sending forms to law enforcement agencies for record checks and to personal references for reference checks. Lerch did not personally conduct interviews. His job was more akin to that of the record searchers, Kayla Smith and Paul Higgins, who were permitted to plead guilty to misdemeanor offenses and received sentences of probation. As defendant acknowledged in her memo, record searchers have a "lower level of responsibility with regard to" background investigations than full-fledged background investigators. Jasper Memo at 15 n.7.

Defendant also cites the cases of Mario Marsans and George Dittman from outside this jurisdiction as examples of background investigators who received sentences of probation. Jasper Memo at 15. Each of these defendants resigned almost immediately from their positions at OPM upon being confronted with evidence of their falsifications, thereby reducing the government's payroll costs and demonstrating very early acceptance of responsibility for their wrongdoing. In contrast, the instant defendant was placed on administrative leave in June 2011, minimized the extent of her falsifications when interviewed about her falsifications in August 2011, and did not resign until late October 2011, thereby costing the government at least four months worth of salary and benefits paid to her while she was on administrative leave. The disparity between the nearly immediate acceptance of responsibility by Marsans and Dittman and the instant defendant's delay in accepting responsibility for her falsifications warrants a disparity between their sentences and her sentence.

was paid in salary.  Jasper Memo at 16.  This is a false dichotomy.  As explained above, it appears that the instant defendant began falsifying in order to raise her timeliness and productivity to the level needed for her to keep her job, avoid demotion, and perhaps even receive her WIGI in pay.  By falsifying interviews and record checks, she was able to close her cases more quickly, improve her timeliness and productivity statistics, obtain a better evaluation, avoid removal or demotion, and have hope of eventually receiving a performance-based pay increase that had previously been denied to her.  Thus, it appears that, like Domico, the instant defendant had a financial motive for falsifying background investigation reports and knowingly placed our national security at risk for personal financial gain.[11]

Accordingly, it is the government's position that a sentence that includes a period of incarceration is consistent with "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct," 18 U.S.C. § 3553(a)(1), (6).

---

[11]In addition, it should be noted that the instant defendant is in good health, unlike either Domico or Weeks, who despite their health problems were sentenced to five months in prison followed by five months of home detention.  PSR ¶¶ 52-53.  Domico had to wear an adult diaper at the time of his sentencing, and Weeks suffered from severe stress, anxiety, fatigue, and the lingering effects of two car accidents and a history of breast cancer.

## **CONCLUSION**

WHEREFORE, the government respectfully requests that this Court impose a sentence of five months of incarceration,[12] followed by a term of supervised release that includes a five-month period of home detention.

Respectfully submitted,

RONALD C. MACHEN JR.
United States Attorney

_____/s/_____
ELLEN CHUBIN EPSTEIN, DC Bar 442861
Assistant United States Attorney
Fraud & Public Corruption Section
555 Fourth Street, N.W., 5th Floor
Washington, DC 20530
(202) 252-1773
Ellen.Chubin@usdoj.gov

---

[12]Given that defendant has a 2-month-old baby, the government would not object to a delayed surrender date or an order that any jail sentence be served on weekends only.

17